```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: November 4, 2013
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                                                       :

UNITED STATES OF AMERICA                 :

    -against-                                       :        12 Cr. 533 (PAC)

DANIEL MONTIEL,                           :

                     Defendant.        :        OPINION & ORDER
                                                                       :
------------------------------------------------------------X

HONORABLE PAUL A. CROTTY, United States District Judge:

       Defendant Daniel Montiel moves to suppress physical evidence and statements that he made to federal agents on the grounds that their admission into evidence would violate his Fourth and Fifth Amendment rights. In particular, Montiel contends that the Government has not demonstrated that he voluntarily consented to the warrantless search of his residence where the physical evidence was seized or that he effectively waived his right to remain silent after receiving *Miranda* warnings. Montiel also seeks to exclude the testimony of Special Agent Angela Lisboa as a sanction for the Government's failure to preserve the handwritten notes she took in connection with his arrest. For the reasons set forth below, the motions are DENIED.

## BACKGROUND

       On July 11, 2012 Mr. Montiel was charged in a two-count indictment with violations of the federal narcotics laws. The Indictment states that on or about June 7, 2012 Montiel "did distribute and possess with the intent to distribute . . . . 1 kilogram and more of mixtures and substances containing a detectable amount of heroin." (Indictment ¶¶ 2–3.)

       On June 11, 2012, DEA agents arrested Montiel. (Gov't Pre-Hr'g Br. 2.) The agents

then conducted a warrantless search of Montiel's residence, where they allegedly found, "among other things, digital scales, measuring spoons, and various narcotics." (*Id.*) Later that day, agents interviewed Montiel in custody at the DEA's Manhattan office, during which he allegedly made incriminating statements. Special Agent Angela Lisboa took handwritten notes and drafted a formal report of the investigation, but her notes were lost.

## TESTIMONY

The Court held a two-day hearing on August 13 and September 4, 2013 on Montiel's motion to suppress. Six witnesses testified: DEA Special Agents Angela Lisboa, Fernando Cruz, Sean Argyros, Matthew Ramarge, Claudia Caballero, and William Melodick. The witnesses testified to the pertinent events as follows.

### I. Defendant's Arrest and the Search of His Apartment

Special Agents Lisboa and Melodick arrested Montiel outside of a bodega in the Bronx. (Tr. 6–7, 135–36.)[1] They handcuffed him and seized two cell phones and the keys to his apartment that he was carrying. (Tr. 136–37.) Two other DEA agents were also present. (Tr. 137.) None of the agents drew their guns in the course of the arrest. (Tr. 7, 136.) Montiel was then placed into Special Agent Melodick's vehicle, and Melodick drove him, along with Lisboa and another agent, Bruce Hom, to another location "a couple blocks away." (Tr. 9, 33.) Melodick explained that "there were people that were standing outside of where the arrest was taking place, so we just removed anyone seeing from what was going on exactly in that area and just to a more quiet place." (Tr. 138.)

Lisboa testified that she attempted to administer *Miranda* warnings to Montiel while they were in the car but was unable to do so because it became apparent that Montiel did not

---

[1] Montiel does not challenge the legality of his arrest.

understand English.  (Tr. 10–11.)  Lisboa testified that she has a "basic knowledge" of Spanish (Tr. 8), and Melodick testified that he does not speak or understand Spanish (Tr. 136, 149.)  Lisboa testified that Agent Hom called a Spanish-speaking agent, Fernando Cruz, to assist with the translation via cell phone in order "for the translation to be done correctly in Spanish."  (Tr. 10–12.)  Cruz testified that he was unfamiliar with the case and that he was simply called to translate.  (Tr. 56.)

According to Cruz, when he spoke on the phone with Montiel, Cruz explained that he worked with the DEA, that the agents were conducting "a long-term investigation," and that "the agents wanted to get consent to enter his apartment."  (Tr. 57.)  When Montiel asked, "Why do they want to enter?," Cruz said that he "basically told him that that's part of the process."  (*Id.*)  When pressed on cross-examination, Cruz also admitted that "in some kind of context," he told Montiel that his consent "would make it easier."  (Tr. 70.)  Cruz testified that Montiel responded that "he would let them go into the apartment, but he wanted to be present"—*i.e.*, that he "conditioned his consent to search the apartment on being present during the search."  (Tr. 57–58, 64.)  Cruz, Lisboa, and Melodick testified that Cruz used a normal tone while on the phone with Montiel, that Montiel appeared calm, and that he did not appear to be either frightened or confused.  (Tr. 13–14, 59, 140.)

Montiel did not sign a written consent-to-search form at that time, although there were Spanish-language forms available in Melodick's vehicle.  (Tr. 35, 141.)  Melodick explained:

> At the time it didn't occur to me; there were a lot of things going on.  And thinking of it now, it would have been much more difficult to try to explain over the phone with [Cruz] the form and something that maybe [Cruz] wasn't even looking at the same exact form that we were looking at.

(Tr. 141.)  Agent Lisboa's report erroneously stated that Montiel had signed such a statement at

the scene; she corrected the report over a year later when she read it and "realized there was a mistake." (Tr. 28, 52.)  And while Agents Lisboa, Melodick, and Argyros testified that they understood that Cruz had given *Miranda* warnings to Montiel during the call (Tr. 14–15, 87, 140–41, 154), Cruz himself testified that he did not do so (Tr. 58–59, 62–63).[2]  The Court credits Cruz's statement and finds that the other agents are mistaken about Montiel's being given *Miranda* warnings at the time of arrest.

Special Agents Ramarge, Argyros, and Group Supervisor Orville Greene arrived at Montiel's apartment before the others and attempted to open the door with Montiel's keys, but they were unsuccessful.  (Tr. 37, 81–83, 91–92, 101–102; Gov't Ex. 2.)  A silent video recording from a camera in the hallway outside the entrance to the apartment shows that Montiel arrived at the entrance about 30 minutes later, escorted by Agents Lisboa, Melodick, and Hom.  (Gov't Ex. 2.)  His hands were rear cuffed, and all six DEA agents were present.  (*Id.*)  None had their guns drawn.  (*Id.*)  Greene held up Montiel's set of keys to ask which one of them opened the apartment, and Montiel indicated nonverbally which was the correct one.  (*Id.*)  After the agents were still unable to unlock the door, Melodick removed one of Montiel's handcuffs and escorted him to the door so that Montiel could unlock his apartment door.  (*Id.*; Tr. 16, 142.)  Montiel appears calm and does not show any sign of protest in the video, which is consistent with the agents' testimony about his demeanor both outside of the apartment and inside during the search (Tr. 16–17, 74–75, 93–94, 142–44).  During the search, Agent Ramarge asked Montiel about whether drugs that had been found in the apartment were his, and he responded that they were not.  (Tr. 103.)  Also during the search, Montiel identified a bedroom as his own.  (Tr. 42–43.)

---

[2] Although the Government maintains its position that Cruz did give the *Miranda* warnings (Tr. 123–24), it "does not intend to introduce in its case in chief any statements made by the defendant prior to his interview at the DEA's office." (Gov't Post-Hr'g Br. 1 n.1.)

## II.     Defendant's Interview at the DEA's Office

After finishing the search, the DEA agents transported Montiel to the DEA's Manhattan office. DEA agents questioned Montiel there, and he allegedly admitted that he had delivered a bag of narcotics to an unknown individual in a livery cab and was to be paid $24,000 for conducting the transaction. (Tr. 26.) Special Agent Claudia Caballero, who speaks fluent Spanish, translated for Agent Lisboa, who conducted the interview. (Tr. 23, 110–11.) Caballero and Lisboa testified that Caballero gave Montiel *Miranda* warnings in Spanish before the start of the questioning. (Tr. 22–23, 111.) Caballero testified that Montiel indicated to her that he understood his rights and waived them (Tr. 113), though Montiel did not sign a form to that effect (Tr. 49–50, 115–17, 119–20). During the interview, however, Montiel did sign a form indicating that he had consented to the earlier search of his residence. (Tr. 77–78, 83–85, 96–97; Mirón Decl. Ex. 3.)

Again, the agents testified that the tone of the interview was calm, with no voices raised, and that no one made any threats or promises to Montiel. (Tr. 22, 79–80, 97–100, 112.) Indeed, Caballero testified that "[Montiel] was calm. He was nice. . . . [T]here was a pleasant conversation. There was no aggression." (Tr. 112.) Caballero and Lisboa testified that Montiel was not handcuffed during the interview. (Tr. 23, 115.)

## III.     Defendant's Affidavit and the Loss of Agent Lisboa's Notes

Montiel submitted his version of the events in an affidavit. The affidavit states that the agents questioned him in the car about drugs and did not advise him of his rights at that time. (Aff. ¶ 6.) It also states that he refused to give the agents permission to enter his apartment and that they threatened to knock down the door if he did not open it. (*Id.* ¶¶ 7–8.) He contends that after he was advised of his rights at the DEA's office, he "continued talking to [the agents]

5

because [he] had already told them things about the case" and that he did not read the forms the agents asked him to sign. (*Id.* ¶¶ 11–12.) These statements were not subject to cross-examination because Montiel did not testify at the hearing.

Agents Ramarge and Caballero testified that they recalled Agent Lisboa taking notes during Montiel's interview at the DEA's office. (Tr. 107, 116.) Agent Melodick also testified that Lisboa had her notebook with her in the car. (Tr. 158.) Lisboa herself stated that it is her practice to take notes but did not recall if she did so on that day. (Tr. 46.) At the end of the first day of the hearing, the Court directed the Government to conduct a thorough search for the notes. (Tr. 124.) At the end of the second day (which took place over three weeks later), counsel for the Government stated that the DEA agents had reported that despite a "thorough search" made with the understanding "that it was important," no one had found the notes. (Tr. 167; *see also* Gov't Post-Hr'g Br. 6 n.4.)

## DISCUSSION

At issue are (1) whether Montiel voluntarily consented to the warrantless search of his apartment; (2) whether he effectively waived his right to remain silent after receiving *Miranda* warnings; and (3) whether the loss of Agent Lisboa's notes warrants sanctioning the Government by drawing an adverse inference regarding their contents or excluding her testimony.

**I.    Motion to Suppress Physical Evidence**

    **A.    Legal Standards**

The Fourth Amendment to the United States Constitution prohibits law enforcement officers from conducting "unreasonable searches and seizures." "[A] search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 219

(1973) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  One exception is where the suspect consents to the search.  *Id.*  "For such a consent to be valid, however, it must be voluntarily and freely given."  *United States v. Sanchez*, 635 F.2d 47, 58 (2d Cir. 1980).  A defendant's consent is involuntary if "his will has been overborne and his capacity for self-determination critically impaired[.]" *Schneckloth*, 412 U.S. at 225 (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)).  The Government "bears the burden of proving by a preponderance of the evidence that the consent was voluntary."  *United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006).

"Voluntariness is a question of fact determined by a 'totality of all the circumstances.'" *United States v. Isiofia*, 370 F.3d 226, 231 (2d Cir. 2004) (quoting *Schneckloth*, 412 U.S. at 227).  Among the factors to be considered are the following:

> age, education, intelligence, length of detention, use of physical punishments or deprivations, and whether the alleged consenting person was advised of his constitutional rights . . . [I]n cases where consent is obtained from a person in custody, . . . [additional relevant factors include] whether guns were drawn or the consenting individual was frisked, . . . or whether the consenting individual was threatened, was in a public area, or was informed that he had the option of refusing consent to the search . . . .

*United States v. Puglisi*, 790 F.2d 240, 243–44 (2d Cir. 1986) (per curiam).  Thus, "[w]hile knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent."  *United States v. Drayton*, 536 U.S. 194, 206–07 (2002).  "[C]onsent may be inferred from an individual's words, gestures, or conduct. . . . [The suspect need] not recite the talismanic phrase: 'You have my permission to search.'"  *United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir. 1981).  "[T]he ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search."  *Isiofia*, 370 F.3d at 231.

Although the Second Circuit has recognized that "consent to search obtained from a person in custody does 'require more careful scrutiny,'" *Puglisi*, 790 F.2d at 233, it has "repeatedly observed that neither the fact that a person is in custody nor that she has been subjected to a display of force rules out a finding of voluntariness." *United States v. Moreno*, 701 F.3d 64, 77 (2d Cir. 2012) (holding that the defendant's consent was voluntary even where there was "forcible entry into [defendant's] motel room by armed agents who both subdued and handcuffed her [and] failed thereafter to inform her that she was not required to consent"). Likewise, "advising a person of the fact that a search warrant can be obtained does not constitute coercion." *United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir. 1983). Consent is ineffective, however, "when that 'consent' has been given only after the official conducting the search has asserted that he *possesses* a warrant." *Bumper v. North Carolina*, 391 U.S. 543, 549 (1968) (emphasis added). That is because mere "acquiescence to a claim of lawful authority" does not indicate voluntary consent. *Id.* at 549; *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993) ("Consent must be a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority.") (citations omitted); *see, e.g.*, *United States v. Ruiz-Estrella*, 481 F.2d 723, 728 (2d Cir. 1973) (holding that the defendant merely acquiesced where "[t]he 'request' took place after the agent, attired in a uniform and badge, took [the defendant] away from the boarding area, into a stairwell . . . closed the door behind them," did not "warn[ the defendant] of his right to refuse the search, [and the defendant] silently hand[ed] over his bag").

### B. Defendant Voluntarily Consented to the Search of His Residence

The Court credits the testimony of Agent Cruz that Mr. Montiel gave his consent for the DEA agents to search his apartment and the testimony of Agents Lisboa and Melodick that the

tone of that conversation was calm and nonthreatening.  "In crediting the agents' testimony, the Court expressly rejects the assertions set forth by [Montiel] in [his] affidavit[], which w[as] not subject to cross-examination because [he] did not testify." *United States v. Pena Ontiveros*, 547 F. Supp. 2d 323, 333 (S.D.N.Y. 2008) *aff'd sub nom. United States v. Rico Beltran*, 409 F. App'x 441 (2d Cir. 2011).  Likewise, the Court credits the agents' testimony concerning the noncoercive nature of the interaction with Montiel at the hallway entrance, which is consistent with the video showing Montiel calmly indicating the appropriate key to open the door and then approaching the door to unlock it himself.

      Significantly, Montiel conditioned his consent on his being present during the search.  Thus, although the agents were under no affirmative obligation to inform him of his right to refuse, *Drayton*, 536 U.S. at 206–07, he appears to have understood that he exercised some control over the situation, *i.e.*, that his "consent mattered," *see Moreno*, 701 F.3d at 78.  Also relevant to the Court's determination is that the agents did not have their guns drawn when arresting Montiel or seeking his consent, that no threats were made to him, and that Montiel signed a form afterwards confirming his consent.  These factors militate against any inference that his "will [was] overborne and his capacity for self-determination critically impaired." *Schneckloth*, 412 U.S. at 225.

      There is no doubt that Montiel was in custody, handcuffed, had already been searched when he gave his consent, and six DEA agents were in the hallway with him when he assisted with opening the door.  But these are only some of the factors for the Court to consider in evaluating whether the "totality of the circumstances" indicates his voluntary consent.  *See Isiofia*, 370 F.3d at 231.  That Montiel was under arrest and subject to the attendant consequences thereof does not alone undermine his consent.  *See Moreno*, 701 F.3d at 77.  There

is also no evidence regarding Montiel's "age, education, or intelligence" that would preclude a finding of voluntariness: although Montiel was not conversant in English, Agent Cruz was able to easily communicate with him in his native Spanish to gain his consent.

Finally, the Court finds that Cruz's statement that Montiel's consent "would make it easier" did not undermine the voluntariness of his consent. As with an officer's assertion that "a search warrant can be obtained," *see Calvente*, 722 F.2d at 1023, the statement that Montiel's consent would "make it easier" is consistent with the idea that his "consent mattered," *see Moreno*, 701 F.3d at 78. Thus, Montiel's consent was not mere "acquiescence to a claim of lawful authority" from Cruz. *See Bumper*, 391 U.S. at 549.

In the light of the agents' credible testimony at the suppression hearing, the Court finds that the Government has established by a preponderance of the evidence that Montiel voluntarily consented to the search of his apartment, and his motion to suppress the physical evidence obtained there is denied.

## II.     Motion to Suppress Defendant's Statements

Montiel argues that his statements must be suppressed because the DEA agents engaged in a deliberate two-step interrogation strategy, and that in any event, the Government has not met its burden to demonstrate that he knowingly and voluntarily waived his right to remain silent. (Def.'s Post-Hr'g Br. 12, 15.)

### A.     Legal Standards

#### 1.     General Rules for Waiver of Fifth Amendment Privilege

The Fifth Amendment to the United States Constitution protects a defendant from being "compelled in any criminal case to be a witness against himself." "A statement is not 'compelled' within the meaning of the Fifth Amendment if an individual 'voluntarily, knowingly

and intelligently' waives his constitutional privilege." *Colorado v. Spring*, 479 U.S. 564, 573 (1987) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). *Miranda* warnings must be given to a suspect in custody prior to questioning in order for the suspect's statements to be admissible in the prosecution's case-in-chief. *See Miranda*, 384 U.S. at 444; *United States v. Simmons*, 661 F.3d 151, 155 (2d Cir. 2011).

A suspect's waiver is effective if it is "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception, and made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Berghuis v. Thompkins*, 130 S.Ct. 2250, 2260 (2010) (quotation marks omitted). "[A] suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police." *Id.* at 2264. In other words, "once those warnings are properly administered[,] . . . a defendant is left to make his own choice as to how best to proceed. . . . *Miranda* and its progeny impose no further burdens on law enforcement officers . . . ." *United States v. Plugh*, 648 F.3d 118, 125-26 (2d Cir. 2011), *cert. denied,* 132 S.Ct. 1610 (2012). Once in court, however, "[t]he Government bears the burden of proving by a preponderance of evidence that a valid waiver occurred." *United States v. Murphy*, 703 F.3d 182, 192 (2d Cir. 2012) (citing *Berghuis*, 130 S.Ct. at 2261). No written waiver is required to meet this burden. *United States v. Spencer*, 955 F.2d 814, 819 (2d Cir. 1992).

### 2. Inappropriate Two-Step Questioning

A suspect does not effectively waive his Fifth Amendment privilege where "a deliberate, two-step strategy [i]s used by law enforcement to obtain the postwarning confession." *United States v. Carter*, 489 F.3d 528, 535 (2d Cir. 2007) (citing *Missouri v. Seibert*, 542 U.S. 600, 622

(2004) (Kennedy, J., concurring)). "The quintessential two-step technique involves a suspect's 'hearing warnings only in the aftermath of interrogation and just after making a confession,' with the police 'lead[ing] him over the same ground again.'" *United States v. Williams*, 681 F.3d 35, 45 (2d Cir. 2012) (quoting *Seibert*, 542 U.S. at 613 (plurality opinion)). "[T]he Government bears the burden of disproving by a preponderance of the evidence that it employed a deliberate two-step strategy." *Id.* at 41.

In order to determine whether the use of two-step questioning was *deliberate*, "a court should review the totality of the objective and subjective evidence surrounding the interrogations, with a recognition that in most instances the inquiry will rely heavily, if not entirely, upon objective evidence." *United States v. Capers*, 627 F.3d 470, 479 (2d Cir. 2010). In reviewing the objective evidence, courts "are guided by, but not limited to," the following five factors:

> [1] the completeness and detail of the questions and answers in the first round of interrogation, [2] the overlapping content of the two statements, [3] the timing and setting of the first and the second, [4] the continuity of police personnel, [5] and the degree to which the interrogator's questions treated the second round as continuous with the first.

*Williams*, 681 F.3d at 40, 44 (quoting *Seibert*, 542 U.S. at 615 (plurality opinion)). For instance, a waiver is likely ineffective if the two-step strategy was "'systematic, exhaustive, and managed with psychological skill,' leaving 'little, if anything, of incriminating potential left unsaid,'" and if the defendant was led "'to cover the same ground a second time'" in an apparent attempt to "make the defendant feel locked into his recently elicited inculpatory statements." *Williams*, 681 F.3d at 44 (quoting *Seibert*, 542 U.S. at 604, 616).

### B. Defendant Was Informed of and Waived His Rights

Quite simply, there was no evidence adduced at the hearing that Montiel's *Miranda*

waiver was anything other than knowing and voluntary. There is quite clearly no evidence of a first round of interrogation which provided for overlapping content of his statements. There were questions at the apartment about whether drugs found at the apartment were Montiel's and which bedroom was his, but those questions did not amount to the kind of interrogation which is at the heart of the prohibition on a two-step interrogation strategy. On the contrary, the Government demonstrated, by a preponderance of the evidence, that (1) Montiel received and understood the *Miranda* warnings at the DEA's office and waived his rights by making an uncoerced statement; and (2) that no deliberate two-step interrogation strategy was used.

Agent Caballero credibly testified that she gave Montiel the *Miranda* warnings before the start of questioning at the DEA's office and that Montiel indicated that he understood and waived his rights. Indeed, Montiel's own affidavit concedes that the "agents informed me of my rights, including the right to remain silent." (Aff. ¶ 11.) The testimony of Caballero and the other agents present also established that the tone of the conversation was calm and that there was nothing about the context of the interview that was coercive. Indeed, Montiel was not handcuffed and Caballero characterized her "conversation" with him as "pleasant."

The hearing also undermined defense counsel's initial theory that the agents engaged in a deliberate, two-step interrogation. The Court has already found that they did not give Montiel his *Miranda* warnings at the time of his arrest, and the agents' testimony about their beliefs to the contrary is mistaken. But other than one or two questions during the search of Montiel's apartment, there is no evidence of any interrogation. Moreover, there is not a shred of evidence that the agents *deliberately* set out to extract pre-*Miranda* confessions from him in order to make him feel "locked into" those statements before administering the warnings and then "cover[ing]

13

the same ground a second time." *See Williams*, 681 F.3d at 44.[3]

In any event, the only pre-*Miranda* questions mentioned at the hearing were (1) whether drugs found there were Montiel's, which he denied; and (2) which bedroom was his. Consideration of the five *Seibert* factors only confirms the Court's conclusion that no inappropriate interrogation strategy was used. *See* 542 U.S. at 615. For instance, the two earlier questions were isolated and dealt with the search; in contrast, the subsequent extended interview was not continuous with the earlier isolated questions; and the timing and setting were clearly distinct. Accordingly, the Court finds that Montiel knowingly and voluntarily waived his right to remain silent, and therefore his motion to suppress his post-*Miranda* statements is denied.

### III. Motion to Sanction the Government for the Loss of Agent Lisboa's Notes

Montiel also asks the Court to sanction the Government for the loss of Agent Lisboa's notes by either excluding her testimony or drawing an adverse inference about the content of the notes.

"Where disclosable evidentiary material which came into the possession of the Government has been lost or destroyed," the determination of whether to impose sanctions depends on "the extent of the Government's culpability for the loss or destruction and the amount of the prejudice to the defense which resulted." *United States v. Miranda*, 526 F.2d 1319, 1325–26 (2d Cir. 1975). Thus, "the Jencks Act, 18 U.S.C. § 3500, imposes no duty on the part of law enforcement officers to retain rough notes when their contents are incorporated into official records and they destroy the notes in good faith." *United States v. Terrell*, 474 F.2d 872,

---

[3] Montiel's post-hearing reply brief all but abandons this argument (at 5), relying only on speculation about what "Lisboa's intent [was] in telling her team members that Mr. Montiel had been *Mirandized*." His prior brief likewise relied on speculation about why the agents drove him to another location after his arrest. (Def.'s Post-Hr'g Op. Br. at 13–14.) In light of the agents' testimony, the Court declines to draw the unsupported inferences that Montiel urges.

877 (2d Cir. 1973). "In such situations . . . , [courts] have held the destruction of the preliminary notes or drafts to be without fault and have refused to infer prejudice to defendants." *United States v. Grammatikos*, 633 F.2d 1013, 1021–22 (2d Cir. 1980).

Here, there is no evidence of Agent Lisboa's—or, more broadly, the Government's—bad faith in the loss of her notes. The Court credits the Government's representation that it searched in good faith to no avail. And while Agent Lisboa's formal report did contain an error about when Montiel signed the consent-to-search form, the Court does not find that the error so undermines Lisboa's credibility as to suggest that she destroyed her notes to prejudice Montiel's defense. Under these circumstances, the Court will not infer that Montiel has suffered prejudice sufficient to warrant the sanctions he seeks.

## CONCLUSION

For the foregoing reasons, Mr. Montiel's motions to suppress evidence and sanction the Government are DENIED. A status conference is scheduled to go forward on Thursday, November 14, 2013 at 4:15 PM in Courtroom 11-D. The time under the Speedy Trial Act, 18 U.S.C. § 3161(h)(7)(A), from November 4, 2013 through November 14, 2013 is excluded.

Dated: New York, New York
November 4, 2013

SO ORDERED

*[signature]*

PAUL A. CROTTY
United States District Judge